LIU, J., Concurring and Dissenting.
To most people who are thrust into a courtroom, the whir and din of the legal process make for a bewildering experience. Counsel is necessary, but even diligent representation does not always ensure due regard for the dignity of a vulnerable yet dangerous individual whose liberty is at stake.
*1115 In this case, a young woman, Christine Barrett, was found mentally retarded and dangerous by a judge, and she was ordered committed to a secure treatment facility. Barrett was not charged with any crime, and the record does not show any criminal history. The order of commitment was for one year, but it is renewable year after year without limit. In all likelihood, the commitment proceeding has irreversibly altered the course of her life. And yet, there is no indication in the record of the proceedings that the trial court spoke directly to Barrett about her rights or any other substantive matter.
The trial court found that Barrett, in addition to having mental retardation, also suffered from mental illness. If Barrett had faced prolonged involuntary commitment on the basis of mental illness instead of mental retardation, she would have been statutorily entitled to an advisement by the court of her right to be tried by a jury. Barrett contends that the Legislature’s selectivity— requiring the advisement for mentally ill persons but denying it to persons alleged to be mentally retarded—proceeds from the objectionable premise that persons in her position are unworthy of an advisement. As stated in her opening brief, she brings an equal protection challenge to this disparate treatment on the ground that “there is no justification for depriving all people identified with having an intellectual or developmental disability from the opportunity to learn of the right to a jury trial, and to act on the information in accordance with their individual abilities.”
I agree with Barrett. Although due process principles do not require involuntary commitment procedures to include a jury trial advisement either for persons who are mentally ill or for persons alleged to be mentally retarded, the statutory requirement of an advisement for one but not the other is unsupported by any facts or findings in the record before us. It is supported only by hypothesized differences concerning the relative abilities of the two groups to understand an advisement. To be sure, many potential committees who are alleged to be mentally retarded have disabilities that preclude any meaningful comprehension of a jury trial advisement. But that is not true of all such persons. Applying our state equal protection guarantee (Cal. Const., art. I, § 7, subd. (a)) as informed by federal constitutional precedent (Cleburne v. Cleburne Living Center, Inc. (1985) 473 U.S. 432 [87 L.Ed.2d 313, 105 S.Ct. 3249] (Cleburne)), I conclude that there is no rational basis for denying Barrett—simply because she was alleged to be mentally retarded— the same advisement and the same dignity afforded by such an advisement to which other persons with mental disabilities are statutorily entitled when facing prolonged involuntary commitment.
Accordingly, I respectfully dissent from the court’s denial of Barrett’s equal protection claim. The court says I would “create a new state constitutional jury trial advisement right for mentally retarded persons.” (Maj. opn., *1116 ante, at p. 1111, fn. 21.) To be clear, my view is not that persons with mental retardation have a freestanding constitutional right to an advisement. As explained below, my view is that persons with mental retardation are, on the record before us, constitutionally entitled to the same statutory advisement right that the Legislature has seen fit to provide to other persons with mental disabilities. But because I agree with the Court of Appeal that any failure to advise was harmless under the circumstances here, I concur in the court’s affirmance of the judgment below.
I.
Christine Barrett was 27 years old and living in a private residence under the care of the San Andreas Regional Center (Regional Center) when the district attorney filed a petition under Welfare and Institutions Code former section 6500 to commit her as a person who is “mentally retarded” and “a danger to herself and others.” (All undesignated statutory references are to the Welfare and Institutions Code.) The petition was filed at the request of Betty Crane, the Regional Center’s service coordinator. The district attorney requested an evidentiary hearing and an order that Barrett be committed to the custody of the State Department of Developmental Services (Department) for up to one year. The petition incorporated by reference a declaration from Crane along with “the assessment, evaluations, reports, and other documents” of the Regional Center. These were filed with the superior court, and we are treating them as confidential exhibits at the request of the parties. The reports attached to the petition are the only expert reports that appear in the record before us; no further reports were submitted by the parties or obtained by the court pursuant to its authority under section 6504.5 to order a report by the director of the regional center or the director’s designee.
The petition was filed on January 22, 2009. On that date, the court set a hearing for March 9, 2009, and placed Barrett under the Department’s care pending resolution of the petition. Counsel for both parties appeared on March 9, and the matter was continued to April 8 for an evidentiary hearing. The only record of that hearing is a printed minute order with no substantive information. It is not clear whether Barrett was present or received any information at that time about the proceeding or her rights therein.
The proceedings resumed on April 8, 2009, in the presence of Barrett and counsel for both parties. The district attorney’s sole witness was Dr. Robert Thomas, a psychologist for the Regional Center. Dr. Thomas testified that Barrett had been previously diagnosed with mental retardation and that she fell within the moderate range of mental retardation with an estimated IQ “[i]n the 50’s to 40’s.” Although he did not conduct a formal cognitive assessment of Barrett, Dr. Thomas based his opinion of Barrett’s mental *1117 retardation on her case file, which included school documents, psychological assessments, and medical documents with results of cognitive tests. He also based his opinion on the fact that Barrett, though initially deemed ineligible for Regional Center services, was accepted for such services in 2001 upon a second review of her case. Dr. Thomas said he personally evaluated Barrett once, during a visit to her apartment, and said he found it “very difficult to have a normal reciprocal conversation with her.”
Dr. Thomas further testified that Barrett had also been diagnosed with a range of psychiatric conditions, including schizophrenia, bipolar disorder, and schizoaffective disorder. He said that individuals like Barrett with a dual diagnosis of mental illness and mental retardation do not always receive the treatment and supervision they need at the Regional Center because the staff there is trained to address mental retardation, not to provide psychiatric treatment.
In addition, Dr. Thomas testified that Barrett was a danger to herself and others based on his review of 20 to 30 incident reports dating back to 2001. He said those reports included numerous accounts of violent behavior, including physical assaults on Regional Center staff, destruction of property, and self-mutilation. Dr. Thomas also said that “[s]he has threatened suicide and verbalized suicidal thoughts” based on one of the incident reports. Although Dr. Thomas could not describe the severity of each incident based on the reports, he testified that Barrett had the potential to cause serious injury to herself and to others because of her inability to control her aggression.
When asked whether Barrett’s mental illness or her mental retardation was the cause of her dangerous behavior, Dr. Thomas said her mental retardation limited her ability “to understand the complexity of her disorder and the need for treatment.” But he also said that given the extent of Barrett’s mental and developmental disorders, “it would be very difficult to differentiate what behavior is attributed to what particular disorder.” Dr. Thomas opined that the least restrictive placement for Barrett was commitment to the secure treatment facility where she had been placed pending disposition of the section 6500 petition.
Barrett testified on her own behalf. She spoke about her current placement, stating a clear preference for placement in a group home rather than the secure facility. She testified that she was taking medication that left her mind “clearer” and helped her to stay calm. The record contains no indication that her attorney or the court inquired into her ability to comprehend the proceedings or the rights to which she was entitled. But Barrett made clear *1118 that she wanted to make her own living and medical decisions: “[I]f I had a choice in life I’d have a choice to have my freedom and I’d have a choice to talk to my doctor.”
Based on the testimony and reports, the trial court found that Barrett was mentally retarded and dangerous under section 6500, and committed her to the custody of the Department for one year. The court acknowledged that “Ms. Barrett presents a complex situation” in light of “a series of mental health diagnoses, many of which seem to be overlapping depending on various times.” The court concluded that her dangerousness is “based upon mental retardation” and “may also have an element of being based on her mental illness.”
The record does not show that the court directly addressed Barrett at any point in the proceedings to explain any rights she might have under state or federal law, including the right to trial by jury. Among other things, Barrett contends that the court’s failure to advise her of the right to demand a jury trial violates the principle of equal protection of the laws.
II.
California has a panoply of statutes providing for the involuntary commitment of individuals who pose a threat to themselves and others. As we recently observed, “[d]ecisions by this court and the United States Supreme Court . . . have used the equal protection clause to police civil commitment statutes to ensure that a particular group of civil committees is not unfairly or arbitrarily subjected to greater burdens.” (People v. McKee (2010) 47 Cal.4th 1172, 1199 [104 Cal.Rptr.3d 427, 223 P.3d 566] [collecting cases].)
Most of California’s civil commitment statutes apply to persons who have been accused or convicted of a crime. (See §§ 1800 et seq. [mentally disordered offenders discharged by juvenile authorities], 3000 et seq. [narcotics addicts], 6600 et seq. [sexually violent predators]; Pen. Code, §§ 1026-1027 [defendants acquitted by reason of insanity]; Pen. Code, § 1367 [defendants found mentally incompetent]; Pen. Code, § 2960 et seq. [mentally disordered offenders].) Only two involuntary commitment schemes—the Lanterman-Petris-Short Act (LPS Act) (§ 5300 et seq.) and section 6500— authorize the state to assert prolonged custody over individuals through proceedings completely separate from the juvenile and criminal justice systems. Section 5300 authorizes the commitment of certain mentally ill persons for 180 days upon a finding of dangerousness. Section 6500 authorizes a renewable one-year commitment for persons found to be mentally retarded and dangerous. Neither statute requires the state to show or charge criminal conduct.
*1119 In framing her equal protection claim, Barrett contrasts the procedures for a 180-day commitment under the LPS Act with the procedures for a one-year commitment under section 6500. The LPS Act expressly recognizes a right to a jury trial (§§ 5302, 5303) and says “the court shall advise the person named in the petition ... of his right to demand a jury trial” (§ 5302). Section 6500, by contrast, does not mention the right to a jury trial or contain any advisement requirement.
Today’s opinion confirms that an individual facing commitment under section 6500 has the right to trial by jury. (Maj. opn., ante, at pp. 1096-1097.) The court endorses “a long and unbroken line of California appellate court cases holding or assuming—largely on the basis of federal and state equal protection principles affecting fundamental interests—that persons alleged to be mentally retarded and dangerous cannot be denied a jury altogether where jury trials are granted by statute to persons alleged to be mentally impaired and dangerous under comparable commitment laws.” (Id. at p. 1097.) I join this holding of the court.
The question here is whether persons facing commitment under section 6500 are also entitled, as a matter of equal protection, to the same advisement of the right to trial by jury that is guaranteed to persons facing commitment under section 5300. It is on this question that I disagree with the court’s opinion.
Barrett additionally contends that section 5302’s advisement requirement means that the decision to waive a jury trial must be made personally by the individual facing commitment under the LPS Act and that this right to personal waiver extends to section 6500 proceedings as a matter of equal protection. The court does not decide whether a right to personal waiver inheres in section 5302 (maj. opn., ante, at p. 1108), and I also see no need to decide that issue. Separate and apart from a right to personal waiver, a jury trial advisement has important value to an individual facing involuntary commitment in at least two ways. First, an advisement may prompt the individual to discuss jury trial concerns with counsel if she is able. Even if counsel can be expected to consult with the client about such concerns when counsel believes it is “necessary or advisable” (maj. opn., ante, at p. 1105), an advisement by the court may have the practical effect of empowering the individual, at her own initiative, to participate in the decision with counsel. Second, an advisement conveys respect for the individual’s understanding of and interest in a key issue—who will be the decision maker, judge or jury?—in a proceeding that may inalterably shape the trajectory of her life. In short, an advisement recognizes the dignity and agency of the individual who appears before the court.
*1120 In addressing Barrett’s equal protection claim, I begin in part III. below by discussing at some length the troubled history of our nation’s and our state’s treatment of persons with mental disabilities. In part IV., I discuss the shortcomings of the court’s analysis of Barrett’s claim. In part V, I elucidate the proper standard of equal protection review and apply it to the statutory classification at issue here.
As my analysis will make clear, the issue in this case is not whether people who are mentally retarded generally have less cognitive ability than people who are mentally ill. Barrett’s claim specifically concerns the ability to understand a jury trial advisement and involves a specific comparison between two groups: mentally ill persons facing 180-day commitment under section 5300 and persons alleged to be mentally retarded under section 6500. In light of historic and continuing misperceptions concerning the ability of persons who are mentally retarded to understand and influence their own fates, I believe the requirement of a jury trial advisement for persons facing commitment under section 5300, but not for persons facing commitment under section 6500, does not survive equal protection scrutiny.
IH.
To fully appreciate the nature of a section 6500 proceeding and the context of Barrett’s claim, it is helpful to begin with some history. Civil proceedings against individuals alleged to be mentally retarded and dangerous have long been thought necessary to protect society as well as the individual involved. But such proceedings also have a regrettably long history of abuse.
A.
This history is familiar to those trained in the law. For it was Justice Holmes’s infamous opinion for the high court in Buck v. Bell (1927) 274 U.S. 200 [71 L.Ed. 1000, 47 S.Ct. 584] that upheld a Virginia statute authorizing the compulsory “sterilization of mental defectives.” (Id. at p. 205.) That category included Carrie Buck, whom the court described as “a feeble minded white woman” who was “the daughter of a feeble minded mother” and “the mother of an illegitimate feeble minded child.” (Ibid.) Echoing the eugenics theories popular at the time, Justice Holmes reasoned: “We have seen more than once that the public welfare may call upon the best citizens for their lives. It would be strange if it could not call upon those who already sap the strength of the State for these lesser sacrifices, often not felt to be such by those concerned, in order to prevent our being swamped with incompetence. It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind. *1121 The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes. [Citation.] Three generations of imbeciles are enough.” (Id. at p. 207.) With the high court’s endorsement, Virginia officials forcibly sterilized Buck along with 8,300 other inmates of state mental institutions between 1927 and 1974, when the law was finally repealed. (See Lombardo, Three Generations, No Imbeciles: Eugenics, the Supreme Court, and Buck v. Bell (2008) p. 294 (Lombardo).)
The high court’s eight-to-one decision in Buck v.. Bell reflected then prevalent attitudes toward persons with mental disabilities. Twenty-five states, including Virginia, had sterilization laws in place at the time Buck v. Bell was decided, and seven others followed suit by 1937. (Lombardo, supra, at p. 294; see ibid, [citing a 1965 study finding that more than 65,000 Americans were sterilized under such laws].) It is tempting to say, from our contemporary perspective, that such laws were the product of unthinking prejudice and blatant disregard for the rights of the individuals affected. But to their proponents, the sterilization laws had a genuinely benign purpose as an alternative to civil confinement. As the Virginia Supreme Court explained in Buck’s case: “Unless sterilized by surgical operation, she must be kept in the custodial care of the [State Colony for Epileptics and Feeble-Minded] for thirty years, until she is sterilized by nature, during which time she will be a charge upon the State. If sterilized under the law, she could be given her liberty and secure a good home, under supervision, without injury to society. Her welfare and that of society would be promoted by such sterilization.” (Buck v. Bell (1925) 143 Va. 310 [130 S.E. 516, 517-518], affd. (1927) 274 U.S. 200 [71 L.Ed. 1000, 47 S.Ct. 584].)
Moreover, the Virginia statute was not devoid of procedural safeguards. (See Buck v. Bell, supra, 274 U.S. at p. 206 [noting “the very careful provisions by which the act protects the patients from possible abuse”].) The high court described the statute’s protections as follows: “The superintendent [of the State Colony for Epileptics and Feeble-Minded] first presents a petition to the special board of directors of his hospital or colony, stating the facts and the grounds for his opinion, verified by affidavit. Notice of the petition and of the time and place of the hearing in the institution is to be served upon the inmate, and also upon his guardian, and if there is no guardian the superintendent is to apply to the Circuit Court of the County to appoint one. If the inmate is a minor notice also is to be given to his parents if any with a copy of the petition. The board is to see to it that the inmate may attend the hearings if desired by him or his guardian. The evidence is all to be reduced to writing, and after the board has made its order for or against the operation, the superintendent, or the inmate, or his guardian, may appeal to the Circuit Court of the County. The Circuit Court may consider the record of the board and the evidence before it and such other admissible evidence as may be offered, and may affirm, revise, or reverse the order of the board and *1122 enter such order as it deems just. Finally any party may apply to the Supreme Court of Appeals, which, if it grants the appeal, is to hear the case upon the record of the trial in the Circuit Court and may enter such order as it thinks the Circuit Court should have entered.” {Id. at pp. 206-207.)
Although the statute did not include a right to counsel, the protections it did afford led the high court to conclude that “[t]here can be no doubt that so far as procedure is concerned the rights of the patient are most carefully considered . . . .” (Buck v. Bell, supra, 274 U.S. at p. 207.) And yet, careful scholars of Buck’s life have come to the conclusion that neither she nor her daughter Vivian was “feeble minded” at all. (See Lombardo, supra, at p. 139 [citing school records showing Buck “was a normal child”]; Bruinius, Better for All the World: The Secret History of Forced Sterilization and America’s Quest for Racial Purity (2006) pp. 76-77 [Vivian completed four semesters of school and made the honor roll before her death at age eight]; Smith & Nelson, The Sterilization of Carrie Buck (1989) p. 194 [reviewing letters written by Buck after her discharge from the colony and concluding that “neither mother or daughter was illiterate despite Oliver Wendell Holmes’ comments”].) Instead, it appears that Buck’s real “deficiency” was that she was an unwed mother, likely as a result of rape, and this was a point of embarrassment and shame for Buck’s foster parents, who filed a petition supporting Buck’s sterilization. (See Lombardo, supra, at pp. 139-140; Bruinius, supra, at pp. 51-53; Smith & Nelson, supra, at p. 5.)
Although the doctrinal underpinnings of Buck v. Bell have been eroded (see Skinner v. Oklahoma (1942) 316 U.S. 535 [86 L.Ed. 1655, 62 S.Ct. 1110]), the case remains a cautionary tale in two respects. First, although state intervention into the lives of individuals with mental disabilities has often been rationalized on the ground that it is for their own good or the good of society, unfounded assumptions of incapacity and a legacy of paternalism have resulted in serious “depriv[ations] of . . . basic liberty” with “subtle, far-reaching and devastating effects.” (Skinner, at p. 541.) Second, even where such intervention is not inherently unlawful, laws directed at controlling individuals with mental disabilities have been prone to overbroad application despite what appear to be “very careful provisions . . . protecting] the patients from possible abuse” (Buck v. Bell, supra, 274 U.S. at p. 206).
B.
California was not immune to the eugenics theories underlying the Virginia legislation at issue in Buck v. Bell. Indeed, by some accounts, California was a pioneer. During the first half of the 20th century, California’s approach to persons who were mentally ill or developmentally disabled centered on *1123 institutionalizing such individuals or otherwise isolating them from the rest of society. A broad range of individuals deemed “feeble minded” or mentally deficient were subject to sterilization. As treatments for mental illness advanced, California made efforts to differentiate mental conditions viewed as treatable from those viewed as hereditary or immutable. Over time, isolation and warehousing gradually gave way to treatment and habilitation. In the 1960s, the Legislature enacted substantive and procedural limits on the state’s authority to commit individuals with mental illness. Protections for persons with mental retardation followed the same general trajectory but lagged behind those afforded to the mentally ill.
In 1909, California became the third state in the nation to pass a sterilization bill. (Stats. 1909, ch. 720, § 1, pp. 1093-1094; see Stem, Eugenic Nation: Faults and Frontiers of Better Breeding in Modem America (2005) p. 99.) California’s law was “perhaps the most expansive legislation of all state acts permitting sterilization.” (Lombardo, supra, at p. 26.) It allowed “any inmate” of any state hospital, the California Home for the Care and Training of Feeble-Minded Children, or any state prison to be “asexualized” whenever a panel of medical officials determined “it would be beneficial and conducive to the benefit of the physical, mental or moral condition” of that individual. (Stats. 1909, ch. 720, § 1, p. 1093.) Although the law applied only to prisoners who had been imprisoned “at least two times for some sexual offense, or at least three times for any other crime” {id. at p. 1094), it placed no substantive limits on the sterilization of persons deemed “feeble minded.”
The 1909 act was repealed in 1913 and replaced with legislation applying to three discrete groups. Before release or discharge, inmates of state hospitals for the insane “afflicted with hereditary insanity or incurable chronic mania or dementia” could be sterilized with or without their consent at the discretion of “the state commission in lunacy . . . after a careful investigation of all the circumstances of the case.” (Stats. 1913, ch. 363, § 1, pp. 775-776.) Recidivists committed to state prison for sexual crimes could also be sterilized whenever the resident physician determined it would be “to the benefit of the physical, mental or moral condition” of the inmate. (Id., § 2, p. 776.) Finally, any “idiot or fool” could be sterilized by the superintendent of any state hospital with the written consent of a parent or appointed guardian. (Id., § 3, p. 776.) Upon written request of the parent or guardian, the operation was to be performed “without charge.” (Ibid.)
The 1913 law was repealed four years later and replaced with two separate statutes. The first statute, enacted in May 1917, expanded the state’s authority to sterilize inmates of mental hospitals before their release if they were found to be afflicted with hereditary mental disease, “the various grades of feeble-mindedness,” or “perversion or marked departures from normal mentality *1124 or . . . disease of a syphilitic nature.” (Stats. 1917, ch. 489, § 1, p. 571.) The second statute, enacted in June 1917, established “an institution to be known as the Pacific colony” devoted to “the care, confinement and instruction of feeble-minded and epileptic persons.” (Stats. 1917, ch. 776, § 1, p. 1623 & preamble, italics omitted.) The statute defined “ ‘feeble-minded’ ” to include persons who were “not insane” but “so mentally deficient that they are incapable of managing themselves and their affairs independently, with ordinary prudence, or of being taught to do so, and who require supervision, control, and care, for their own welfare, or for the welfare of others, or for the welfare of the community.” (Id., § 16, p. 1626.) The June 1917 statute marked the first effort by the Legislature to differentiate between persons classified as “insane” (mentally ill) and those classified as “feeble-minded” (mentally retarded) in the context of civil commitment.
The June 1917 statute created a procedure for involuntary commitment that later became section 6500. “[A]ny parent, guardian or other person charged with the support of a supposedly feeble-minded person” could petition the court for admission of the individual to the Pacific colony. (Stats. 1917, ch. 776, § 17, p. 1626.) The petitioner had to submit a verified affidavit “disclos[ing] his reasons for supposing such person to be eligible for admission.” (Ibid.) Peace officers could also petition for commitment, but they were required to provide written notice of the petition to the “parent, guardian or other person charged with such support” of the proposed committee, if known. (Ibid.)
If a person was found to be “feeble-minded,” the judge could order the person committed indefinitely to the Pacific colony, so long as the person had been a resident of California for at least a year. (Stats. 1917, ch. 776, § 19, pp. 1626-1627.) The only provision for discharge or release was at the discretion of the institution’s board of trustees. (Id., § 41, p. 1631.) Before discharge, the board of trustees could order sterilization “with or without the consent of the inmate” upon a recommendation of the superintendent based on “careful investigation of all the circumstances.” (Id., § 42, p. 1631.) The statute declared that such sterilization “shall be lawful” and deemed the trustees and “any person participating in the operation” immune from civil or criminal liability. (Ibid.) In 1937, the Legislature added a provision requiring the court in a commitment proceeding to give “due notice of the hearing of the petition” to the “alleged incompetent.” (Stats. 1937, ch. 369, § 5254, p. 1137.)
During the 1950s, improved medical treatments and increased public awareness of the “scandalous conditions in state mental institutions” gave rise to a deinstitutionalization movement. (Levy & Rubenstein, The Rights of People with Mental Disabilities (1996) p. 19 [citing Deutsch, The Shame of *1125 the States (1948)].) From midcentury through the 1970s, California took a series of important if halting steps that would, at one point, establish our state as a leader in protecting the civil rights of persons with mental disabilities. As explained below, reforms applicable to persons with mental illness focused on procedural rights that gave such individuals the opportunity to participate in and make decisions about their care to the extent possible. By contrast, reforms applicable to persons with mental retardation began with substantive limits on the state’s authority to order involuntary commitment. Although procedural protections followed, they generally lagged behind the protections afforded to persons with mental illness.
The first step toward reform came in 1951, when California enacted a new sterilization scheme for all persons with mental disabilities under the jurisdiction of the Department of Mental Hygiene. (Stats. 1951, ch. 552, § 1, pp. 1706-1707.) For the first time, the Legislature required written notice to the patient and his or her guardians of any proposed sterilization and created a procedure for individuals to object and seek judicial review. (Ibid.) If the patient or a family member filed a written objection within 30 days, the department director was required to “make full inquiry into the case, and may hold a hearing.” (Id. at p. 1707.) If the director decided that the patient should be sterilized despite the patient’s or the family’s objection, the director had to provide written notice of the decision and the right to petition the superior court for review. Whether due to this law or to other factors, the use of sterilization in California dropped significantly. After sterilizing over 19,000 ■ individuals between 1909 and 1949, the state performed only 981 procedures between 1949 and 1959. (Lombardo, supra, at pp. 241-242.)
In 1965, the commitment scheme for “feebleminded” persons was recodified, and the term “feebleminded” was replaced with “mentally deficient persons.” (Stats. 1965, ch. 391, § 4, pp. 1630, 1668 [former § 5590].) Individuals who were adjudged “mentally deficient” and who had resided in the state for at least one year could be ordered committed to the Department of Mental Hygiene for placement in the Sonoma State Home or the Pacific colony. (Id., p. 1670.) Individuals who had been in the state for less than one year could also be committed to the department “for the purpose of transportation of such person to the state of his legal residence.” (Ibid.)
In 1967, California enacted the LPS Act in order “[t]o end the inappropriate, indefinite, and involuntary commitment of mentally disordered persons and persons impaired by chronic alcoholism, and to eliminate legal disabilities.” (Stats. 1967, ch. 1667, § 36, p. 4074 [former § 5001, subd. (a)].) The LPS Act created a tiered scheme for involuntary commitment of individuals with mental illness. Upon “reasonable cause,” peace officers or other designated professionals could place an individual believed to be dangerous or *1126 gravely disabled into custody for 72-hour treatment and evaluation. (Stats. 1967, ch. 1667, § 36, p. 4077 [former § 5150].) Staff at the facility could then certify the individual for an additional 14-day involuntary intensive treatment (id., pp. 4085-4086 [former § 5250]), subject to judicial review (id., pp. 4088-4089 [former § 5275 et seq.]). After 14 days, an individual could be committed for an additional 90 days only after a hearing to determine whether the individual presented “an imminent threat of substantial physical harm to others.” (Id., p. 4089 [former § 5300].) The statute required the court to appoint counsel to represent the person in that hearing, and the statute required counsel to advise the proposed committee of his or her rights. (Id., p. 4090 [former § 5302].) Alternatively, an individual found to be “gravely disabled” could be committed through a one-year conservatorship. (Id., pp. 4093^4098.) Before such commitment, the individual had a right to demand a jury trial. (Id., p. 4094 [former § 5350, subd. (d)].)
Many of the LPS Act’s procedures for commitment of mentally ill persons remain in place today (see post, at p. 1129), although the 90-day commitment has been extended to 180 days (see § 5300 [current]). By all accounts, the LPS Act was a genuine step forward in protecting the rights of such individuals facing civil commitment. “The LPS Act has been called a ‘Magna Carta for the Mentally Ill’ that ‘established the most progressive . . . commitment procedures in the country.’ ” (In re Qawi (2004) 32 Cal.4th 1, 17 [7 Cal.Rptr.3d 780, 81 P.3d 224], quoting Assem. Subcom. on Mental Health Services, Dilemma of Mental Commitments in California (1978) foreword by Assemblyman Louis Papan.)
In contrast to the commitment procedures for persons with mental illness, the LPS Act simply recodified the existing commitment scheme for “mentally deficient persons,” moving the statute to section 6500 and replacing the phrase “mentally deficient persons” with “ ‘mentally retarded persons.’ ” (Stats. 1967, ch. 1667, § 37, pp. 4107, 4134-4137.) Whereas the prior version of the statute applied to “[a]ny mentally deficient person,” the statute now provided: “Any mentally retarded person requiring hospitalization may be committed to the Department of Mental Hygiene . . . .” (Id., at p. 4134 [former § 6501].) The LPS Act did not explain what conditions might “requir[e] hospitalization”; it simply provided that the court could order a hospitalization commitment simply upon a finding that the person was “mentally retarded.” (Id., at p. 4136.) The LPS Act did not give individuals facing commitment under section 6500 a right to counsel.
As enacted in 1967, the LPS Act also recodified the sterilization procedures established in 1951, authorizing the sterilization of individuals with hereditary mental disease, mental retardation, and other “[m]arked departures from *1127 normal mentality.” (Stats. 1967, ch. 1667, § 40, pp. 4146, 4155 [former § 7254].) The sterilization law was not repealed until 1979. (Stats. 1979, ch. 552, § 1, p. 1762.)
In 1970, the Legislature enacted former section 6500.1, establishing the first substantive limit on the state’s authority to involuntarily commit individuals with developmental disabilities. The act provided: “On and after July 1, 1971, no mentally retarded person may be committed to the Department of Mental Hygiene pursuant to this article, unless he is a danger to himself or others.” (Stats. 1970, ch. 351, § 3, p. 765.)
Even as the 1970 act imposed a requirement of dangerousness as a substantive limit on the involuntary commitment of persons with mental retardation, a second bill passed later that year established an additional procedural protection for persons with mental illness. In addition to providing the right to counsel, the Legislature beginning in 1970 required trial courts to advise mentally ill persons facing prolonged commitment of their right to demand a jury trial. (Stats. 1970, ch. 1627, § 17, p. 3443.) This advisement requirement, now codified at section 5302, is the basis of Barrett’s equal protection claim.
It was not until 1975 that the Legislature provided the right to counsel in section 6500 proceedings. (Stats. 1975, ch. 694, § 27, p. 1651.) The 1975 act also imposed a substantive time limit on commitment, providing that any order for commitment would automatically expire after one year. (Ibid.) Any party authorized to submit an original petition for commitment could file subsequent petitions for additional one-year periods of commitment, and each subsequent petition would follow the same procedures applicable to the original petition. (Ibid.) These provisions remain in place today. (See § 6500.)
Ten years after the LPS Act was passed, the Legislature in 1977 extended the LPS Act’s goal of ending “inappropriate, indefinite, and involuntary commitment” to individuals with developmental disabilities, a term defined to include mental retardation. (Stats. 1977, ch. 1167, § 1, p. 3824 [former § 5001].) At the same time, the Legislature enacted the Lanterman Developmental Disabilities Services Act (Lanterman Act). (Stats. 1977, ch. 1252, § 550, pp. 4520-4521.) The Lanterman Act expanded community-based treatment and habilitation services for persons with a wide range of developmental disabilities, and it declared that “[p]ersons with developmental disabilities have the same legal rights and responsibilities guaranteed all other individuals,” including “[a] right to dignity” (Stats. 1977, ch. 1252, § 550, pp. 4521-4522, p. 4712 [codified at § 4502, subd. (b)]) and, as provided by a 1992 amendment, a right “to make choices in their own lives” (Stats. 1992, ch. 1011, § 3, p. 4712 [codified at § 4502, subd. (j)]). However, the Lanterman *1128 Act did not extend the LPS Act’s full panoply of procedural and substantive protections to persons facing commitment under section 6500.
Since 1977, a number of amendments have been made to the section 6500 scheme. (See Stats. 1977, ch. 695, § 7, pp. 2248-2249 [providing a nonexclusive definition of “dangerousness” to include incompetence to stand trial for specific provisions of the Pen. Code]; Stats. 1978, ch. 1319, § 1, p. 4316 [repealing definition of “mentally retarded”]; Stats. 1978, ch. 429, § 220, pp. 1462-1463 [amending list of Pen. Code sections related to definition of “dangerousness”]; Stats. 1989, ch. 897, § 47, pp. 3079-3080 [same]; Stats. 1993, ch. 610, § 33, pp. 3433-3435 [same]; Stats. 1994, ch. 224, § 10, pp. 1791-1792 [same]; Stats. 1996, ch. 1075, § 20, pp. 7237-7238 [same]; Assem. Bill No. 1472, approved by Governor, June 27, 2012 (2011-2012 Reg. Sess.) [replacing the term “mental retardation” and similar terms with “developmental disability” and enacting substantive changes to the term of commitment].) But the basic procedures for- involuntary commitment under section 6500 have remained unchanged since the mid-1970s. For the sake of consistency with today’s majority opinion, I will cite and quote from the section 6500 scheme as it existed at the time of Barrett’s commitment proceedings. (Maj. opn., ante, at p. 1088, fn. 2.)
IV.
With this historical context, I now turn to Barrett’s equal protection claim, beginning with an examination of today’s opinion.
A.
In rejecting Barrett’s claim, the court says “the critical factor is the distinct ‘mentality’ (former § 6507) covered by the two schemes.” (Maj. opn., ante, at p. 1108.) The court observes that mental disorders “may arise suddenly and, for the first time, in adulthood”; that “[t]he LPS Act process itself assumes that the need for treatment may be temporary, and that disabling mental disorders may be intermittent or short lived”; and that “ ‘ “mental illness ‘often strikes only limited areas of functioning, leaving other areas unimpaired, and consequently . . . many mentally ill persons retain the capacity to function in a competent manner.’’ ” ’ [Citation.]” (Id. at p. 1109.) “These characteristics suggest that the mental conditions that create eligibility for an extended 180-day LPS Act commitment, though they include imminent dangerousness, do not necessarily imply incompetence or a reduced ability to understand, and make decisions about, the conduct of the proceedings. Hence, nothing compels the conclusion that such LPS Act patients will not benefit from the statutory right to a jury trial advisement set forth in section 5302. By contrast, in the case of persons alleged to be mentally retarded and *1129 dangerous under section 6500, the commitment process itself raises substantial doubts about their cognitive and intellectual functioning sufficient to limit the personal and procedural role they play. It follows that the two groups are not similarly situated as to the function that Barrett implies an advisement like section 5302 serves—comprehending and controlling the decision whether to request a jury trial. Thus, any disparate statutory treatment with respect to jury trial advisements does not deprive persons like Barrett of equal protection of the law.” (Id. at p. 1109.)
I do not disagree that there are real differences between persons facing •commitment under section 5300 and persons facing commitment under section 6500. But those differences, properly understood, do not support a categorical distinction between the two groups with respect to a jury right advisement.
As an initial matter, even if mental disorders are often temporary, intermittent, or treatable with medication, it is not the case that all persons subject to a 180-day commitment under the LPS Act are capable, at the time of the proceeding, of comprehending a section 5302 advisement. Indeed, under the graduated scheme of increasingly lengthy commitment set forth by the LPS Act (see §§ 5150 [initial 72-hour “treatment and evaluation”], 5250 [14-day commitment for “intensive treatment”], 5270.15 [30-day commitment for additional “intensive treatment”]), one can logically infer that many individuals facing a 180-day commitment under section 5302 have mental disorders that are not temporary, intermittent, or susceptible to effective treatment. The most the court can say about “the mental conditions that create eligibility for an extended 180-day LPS Act commitment” is that they “do not necessarily imply incompetence or a reduced ability to understand ... the conduct of the proceedings.” (Maj. opn., ante, at p. 1109, italics added.) The implication is that at least some (and probably many) potential committees under section 5300 will have mental conditions that preclude comprehension of the proceedings. Those individuals “will not benefit from the statutory right to a jury trial advisement” (maj. opn., ante, at p. 1109), but the trial court is required to give the advisement anyway. (§ 5302.)
Just as there are individuals facing commitment under section 5300 who cannot understand a jury right advisement, there are individuals facing commitment under section 6500 who can. Why else would former section 6500 say that “[i]n any proceedings conducted under the authority of this article, the alleged mentally retarded person shall be informed of his or her right to counsel by the court. . .”? And why else would former section 6504 say that “[i]n all cases the court shall require due notice of the hearing of the petition to be given to the alleged mentally retarded person”? These provisions do not imply that all potential section 6500 committees can understand an advisement. But they appear to be premised on the notion that a subset of *1130 potential committees can, for “[t]he law neither does nor requires idle acts.” (Civ. Code, § 3532.) That is not to say that a jury trial advisement is required whenever a civil commitment statute requires notice of the right to counsel. It is to say that the rationale for denying a jury trial advisement in section 6500 proceedings cannot be that persons subject to such proceedings are categorically incapable of comprehending the advisement.
As the United States Supreme Court has observed, persons who are classified as mentally retarded comprise a “large and diversified group,” ranging “from those whose disability is not immediately evident to those who must be constantly cared for.” (Cleburne, supra, 473 U.S. at p. 442; see Wald, Principal Paper in The Mentally Retarded Citizen and the Law (The President’s Com. on Mental Retardation, 1976) p. 5 [“Retarded people, like all people, vary enormously in talent, aptitude, personality, achievement, and temperament. . . . Each person’s capacities must be judged individually before he can be denied rights of citizenship or humanity.”].) “The American Association on Mental Deficiency (AAMD) has defined mental retardation as ‘ “significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period.” ’ ” (Cleburne, supra, 473 U.S. at p. 442, fn. 9.) With respect to intellectual functioning, persons diagnosed as mentally retarded typically have an IQ of 70 to 75 or below. (American Assn, on Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Supports (10th ed. 2002) pp. 57-58 (AAMR).) But among such individuals, there are significant differences in cognitive abilities.
The AAMR guidelines specify four different degrees of mental retardation, from mild to profound. According to that classification system, an adult with an IQ between 50 and 70 is deemed to have “mild” mental retardation. (AAMR, supra, at p. 104; see also Cleburne, supra, 473 U.S. at p. 442, fn. 9.) A mildly mentally retarded person is “[l]ikely to [have] some learning difficulties in school,” but “[m]any adults will be able to work and maintain good social relationships and contribute to society.” (AAMR, at p. 104.) Mild mental retardation in adults is equivalent to a “mental age from 9 to under 12 years.” (Ibid.) As to what such a “mental age” might mean, I note that California’s history and social studies curriculum expects fifth graders to be able to learn, among other things, “the significance of the new Constitution of 1787, including the struggles over its ratification and the reasons for the addition of the Bill of Rights.” (Cal. Dept, of Education, History-Social Science Framework for California Public Schools Kindergarten Through Grade Twelve (2005) p. 73.) Many fifth graders are no doubt capable of understanding the importance of trial by jury.
The vast majority of persons who are mentally retarded are classified as mildly retarded (see Cleburne, supra, 473 U.S. at p. 442, fn. 9), although it is *1131 unclear what proportion of individuals facing commitment under section 6500 are mildly retarded. But it must be remembered that the class of individuals denied the right to advisement by section 6500 is not limited to individuals who are, in fact, mentally retarded. Rather, it is comprised of persons alleged to be mentally retarded. The statutory scheme does not presume that an individual subject to a section 6500 proceeding is mentally retarded. Instead, it repeatedly refers to an “alleged mentally retarded person” (§ 6505, former §§ 6500, 6504, 6504.5, 6506, 6507, italics added), and the section 6500 proceeding is designed to determine whether a person is mentally retarded and dangerous. Assuming that some potential committees are found not to be mentally retarded, the range of cognitive abilities among persons subject to section 6500 proceedings is even broader than the range of such abilities among persons found to be mentally retarded.
In discussing Barrett’s due process claim, the court cites several of our cases for the proposition that persons who are mentally impaired are unable to act in their own best interests and concludes that “[s]imilar logic applies here.” (Maj. opn., ante, at p. 1103.) But none of those cases supports the categorical denial of a jury trial advisement to persons alleged to be mentally retarded under section 6500. People v. Masterson (1994) 8 Cal.4th 965 [35 Cal.Rptr.2d 679, 884 P.2d 136] addressed waiver, not advisement, of the jury trial right in the context of a criminal competence hearing, and unlike the process for initiating a section 6500 proceeding (see post, at pp. 1132-1133), there must be “ ‘substantial evidence’ raising] a ‘ “reasonable doubt” ’ ” as to the defendant’s competence before a hearing is conducted on the issue. (Maj. opn., ante, at p. 1102, fn. 16.) In Thorn v. Superior Court (1970) 1 Cal.3d 666, 674-675 [83 Cal.Rptr. 600, 464 P.2d 56], we observed that a mentally ill person facing involuntary 14-day treatment under the LPS Act may lack the capacity to comprehend his statutory rights. Yet we made that observation not as a reason to dispense with statutorily required advisements (Thorn, at p. 674), but as a reason to establish additional “procedures . . . which will assure that the patient’s rights receive meaningful protection” (id. at p. 675). Finally, it is true that In re Hop (1981) 29 Cal.3d 82, 90-91 [171 Cal.Rptr. 721, 623 P.2d 282] recognized that a “developmentally disabled adult too incompetent to admit herself to a mental hospital was not competent to protest or consent to hospitalization by third parties under the [Lanterman Act] . . . .” (Maj. opn., ante, at p. 1103.) But the court nevertheless held that such developmentally disabled individuals are, as a matter of equal protection, “entitled to the same congeries of rights” made available to “proposed conservatees under the Lanterman-Petris-Short Act.” (In re Hop, at p. 93.)
B.
Today’s opinion says that “the commitment process itself raises substantial doubts about [potential committees’] cognitive and intellectual functioning *1132 sufficient to limit the personal and procedural role they play.” (Maj. opn., ante, at p. 1109, italics added; see id. at p. 1089 [“The section 6500 procedure itself undermines Barrett’s assumption that persons alleged to be mentally retarded and dangerous can necessarily decide for themselves, in a knowing and intelligent manner, whether to demand a jury at their commitment trials.”].) According to the court, the section 6500 process begins when “a responsible and interested party” requests the filing of a section 6500 petition. (Maj. opn., ante, at p. 1104.) The requesting party presents “strong evidence” (id. at p. 1089) and “specific information” (id. at p. 1104), verified by affidavit, that the individual is mentally retarded. After the petition is filed, the trial court receives a “professional pretrial evaluation” of the individual and “informed recommendations on treatment and placement” from the regional center. (Ibid.) This account of the process leads the court to conclude that “someone like Barrett, who is alleged to be mentally retarded and dangerous under section 6500, is not in a position ... to sufficiently comprehend the jury trial advisement. . . .” (Id. at p. 1105.)
According to the court, the process that sets in motion a section 6500 proceeding effectively identifies persons who are in fact, or should be presumed to be, not only mentally retarded but so much so that they cannot understand a jury trial advisement. But, as previously noted (ante, at p. 1102), such a conclusion defies the essential premise underlying other advisements that a court must give in a section 6500 proceeding. Moreover, in describing the commitment process, the court applies its own gloss instead of focusing on what the statute actually says.
Section 6502 requires that a request for the filing of a section 6500 petition “shall state the petitioner’s reasons for supposing the person to be eligible for [commitment], and shall be verified by affidavit”—nothing more. The statute contains no requirement that the reasons be “strong” (maj. opn., ante, at p. 1089) or “specific” (id. at p. 1104), nor does it otherwise specify what quantum of evidence is necessary to trigger the filing of a section 6500 petition. Further, the court describes the persons authorized to request a petition (a parent, guardian, conservator, probation officer, corrections official, or regional center director, among others) as “responsible and interested” parties. (Maj. opn., ante, at p. 1104.) This may be true in most cases, but the statute plainly contemplates exceptions. (See § 6510 [“In case of the dismissal of the petition, the court may, if it considers the petition to have been filed with malicious intent, order the petitioner to pay the expenses in connection therewith . . . .”]; former § 6511 [“Any person who knowingly contrives to have any person adjudged to be mentally retarded under the provisions of this article, unlawfully or improperly, is guilty of a misdemeanor.”].) Even apart from circumstances as fraught as Carrie Buck’s, it is not hard to imagine scenarios in which the physical, emotional, or financial costs of caring for a “difficult” adult child or ward may result in a section 6500 *1133 commitment proceeding that is neither necessary nor appropriate for that individual. (See Heller v. Doe (1993) 509 U.S. 312, 347 [125 L.Ed.2d 257, 113 S.Ct. 2637] (dis. opn. of Souter, J.) (Heller) [parents, guardians, and close family members may have interests adverse to an allegedly retarded person facing commitment].) And even when the request and petition process does identify a person who is mentally retarded, it cannot be assumed that the person cannot comprehend a jury trial advisement. (Ante, at pp. 1102-1103.)
Furthermore, it is true that section 6504.5 requires the regional center to provide a professional evaluation and informed recommendations to aid the trial court. But the regional center’s report has no bearing whatsoever on who is made subject to a section 6500 petition. That is because the trial court requests and receives the report after the petition has already been filed. (Former § 6504.5 [“Wherever a petition is filed pursuant to this article, the court shall appoint the director of a regional center . . . , or the designee of the director, to examine the alleged mentally retarded person, [f] Within 15 judicial days after his or her appointment, the regional center director or designee shall submit to the court in writing a report. . . .”].) The report does not help to establish at the time the petition is filed that the person alleged to be mentally retarded and dangerous is in fact a person who is “not in a position ... to sufficiently comprehend the jury trial advisement” (maj. opn., ante, at p. 1105).
In addition, although regional centers undoubtedly provide valuable services to needy clients and helpful expertise to our trial courts, we have acknowledged that budgetary considerations place a “subtle strain ... on the center’s impartial neutrality and detachment.” (In re Hop, supra, 29 Cal.3d at p. 92.) The court in In re Hop unanimously observed that regional centers face “subtle pressure favoring hospital treatment as opposed to community placement of the ward. Local community placement may be difficult to locate and also expensive, and its cost may be borne locally by a regional center’s budget. Hospital placements are funded from statewide sources.” (Ibid.) This concern provides an additional reason to reject the court’s unqualified confidence that a person subject to a section 6500 proceeding is a person who is so cognitively impaired that he or she cannot understand a jury trial advisement.
In sum, the distinction between persons facing commitment under section 5300 and persons facing commitment under section 6500 is not a distinction between who can understand a jury trial advisement and who cannot. There are many individuals facing commitment under section 5300 who cannot understand such an advisement, and there are many individuals facing commitment under section 6500 who can. If there is a rational basis for requiring an advisement for one group but not the other, it cannot rest on a categorical description of the capabilities of one or both groups.
*1134 V.
A different response to Barrett’s equal protection claim is that the Legislature could have differentiated between section 5300 and section 6500 proceedings on the basis of generalizations rather than categorical claims about the two groups facing commitment. The Legislature could have assumed that most potential section 5300 committees can understand a jury trial advisement, whereas most potential section 6500 committees cannot. Or the Legislature could have speculated that the share of individuals capable of understanding an advisement is simply greater among persons facing commitment under section 5300 than among persons facing commitment under section 6500. In essence, this is a rationale based on administrative burdens. Although not every person facing commitment under section 6500 is incapable of understanding an advisement, the Legislature could have assumed that the share of persons under section 6500 with that ability, compared to the share of such persons under section 5300, is not large enough to justify burdening the trial courts with giving an advisement in every case.
Further, the court posits an additional rationale for the legislative scheme: “Nothing compels the state ‘to choose between attacking every aspect of a problem or not attacking the problem at all.’ [Citation.] Far from having to ‘solve all related ills at once’ [citation], the Legislature has ‘broad discretion’ to proceed in an incremental and uneven manner without necessarily engaging in arbitrary and unlawful discrimination [citation].” (Maj. opn., ante, at p. 1110.) The argument is that the Legislature may proceed “one step at a time.” (Williamson v. Lee Optical Co. (1955) 348 U.S. 483, 489 [99 L.Ed. 563, 75 S.Ct. 461] (Lee Optical).)
In considering the “administrative burden” and “one step at a time” rationales, I begin by observing that these two justifications for legislative classification are hallmarks of conventional rational basis review, a highly deferential standard of equal protection review paradigmatically applicable to social and economic legislation. (E.g., FCC v. Beach Communications, Inc. (1993) 508 U.S. 307, 314-320 [124 L.Ed.2d 211, 113 S.Ct. 2096] (Beach Communications) [applying “regulatory-efficiency” rationale to uphold statutory definition of “ ‘cable system’ ”]; Lee Optical, supra, 348 U.S. at p. 489 [applying “one step at a time” rationale to uphold statute that prohibited opticians, but not sellers of ready-to-wear glasses, from fitting or duplicating lenses without a prescription from an optometrist or ophthalmologist]; American Bank & Trust Co. v. Community Hospital (1984) 36 Cal.3d 359, 374 [204 Cal.Rptr. 671, 683 P.2d 670] (American Bank) [applying “administrative costs” rationale to uphold statute authorizing periodic payment procedure for some but not all medical malpractice victims].) The “irrelevan[ce]” of “whether the conceived reason for the challenged distinction actually motivated the legislature” is also characteristic of conventional rational basis *1135 review. (Beach Communications, at p. 315.) The inquiry examines what the Legislature could have believed because the statutory classification must be upheld “if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.” (Id. at p. 313.) The Legislature need not actually articulate its rationale, and “a legislative choice . . . may be based on rational speculation unsupported by evidence or empirical data.” (Id. at p. 315.)
If conventional rational basis review were applicable here, I would have no difficulty upholding the distinction between section 5300 and section 6500 proceedings in terms of jury trial advisement, because either the “administrative burden” or the “one step at a time” rationale is within the realm of rational legislative speculation. The question, however, is whether conventional rational basis review is the appropriate standard here. We are not dealing in this case with a legislative classification that distinguishes among cable operators, eye care specialists, or medical malpractice victims. The statutory schemes at issue here draw a distinction between mentally disordered and alleged mentally retarded persons subject to involuntary commitment, ensuring for one while denying to the other an advisement of the right to trial by jury. As I explain below, conventional rational basis review is not the proper standard in this context.
A.
In Cleburne, supra, 473 U.S. 432, the United States Supreme Court considered an equal protection challenge to a city ordinance that required a special permit for locating a group home for mentally retarded persons in a residential neighborhood. The high court began its analysis by examining whether mental retardation is a quasi-suspect classification calling for heightened scrutiny. (Id. at p. 442.) Observing that there are “real and undeniable differences between the retarded and others” (id. at p. 444) and that many federal and state policies specifically seek to benefit and address the needs of mentally retarded persons (id. at pp. 443-445 [discussing various education, habilitation, and antidiscrimination statutes]), the court expressed concern that “merely requiring the legislature to justify its efforts” in the terms required by heightened scrutiny “may lead it to refrain from acting at all” (id. at p. 444). For this reason, among others, the court “refus[ed] to recognize the retarded as a quasi-suspect class” and instead held that “legislation that distinguishes between the mentally retarded and others must be rationally related to a legitimate governmental purpose.” (Id. at p. 446.) “This standard, we believe, affords government the latitude necessary both to pursue policies designed to assist the retarded in realizing their full potential, and to freely and efficiently engage in activities that burden the retarded in what is essentially an incidental manner.” (Ibid.)
*1136 In applying this standard of review, the high court observed that the city ordinance required a special permit for a group home for the mentally retarded but not for many other uses, including apartment houses, multiple dwellings, boarding houses, fraternity or sorority houses, dormitories, apartment hotels, hospitals, sanitariums, nursing homes, and private clubs. (Cleburne, supra, 473 U.S. at p. 447.) The court then proceeded to consider several possible justifications for this differential treatment. First, it noted that the Cleburne City Council “was concerned with the negative attitude of the majority of property owners . . ., as well as with the fears of elderly residents of the neighborhood.” (Id. at p. 448.) The court rejected this rationale on the ground that “mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home for the mentally retarded differently from apartment houses, multiple dwellings, and the like.” (Ibid.; see ibid. [“Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.” (quoting Palmore v. Sidoti (1984) 466 U.S. 429, 433 [80 L.Ed.2d 421, 104 S.Ct. 1879])].)
Second, the city council was concerned that students at a nearby middle school “might harass the occupants” of the group home. (Cleburne, supra, 473 U.S. at p. 449.) The court said that “denying a permit based on such vague, undifferentiated fears is again permitting some portion of the community to validate what would otherwise be an equal protection violation.” (Ibid.) Third, in response to the city council’s concern that the group home would be located on a flood plain, the court said the possibility of a flood did not justify treating a group home for the mentally retarded differently from nursing homes, sanitariums, or hospitals. (Ibid.) The court was similarly unpersuaded by the city council’s “doubts about the legal responsibility for actions which the mentally retarded might take,” finding it “difficult to believe” that the group home “would present any different or special hazard” than boarding or fraternity houses. (Ibid.)
Fourth, “the Council was concerned with the size of the home and the number of people that would occupy it.” (Cleburne, supra, 473 U.S. at p. 449.) The court again reasoned that it “is not at all apparent” why a group home for the mentally retarded “warrants a density regulation that others need not observe.” (Id. at p. 450.) “At least this record does not clarify how ... the characteristics of the intended occupants of the [group] home rationally justify denying to those occupants what would be permitted to groups occupying the same site for different purposes.” (Ibid.) Finally, the city expressed concern about “avoiding concentration of population and . . . lessening congestion of the streets” as well as “fire hazards, the serenity of the neighborhood, and the avoidance of danger to other residents.” (Ibid.) But the court said: “These concerns obviously fail to explain why apartment *1137 houses, fraternity and sorority houses, hospitals and the like, may freely locate in the area without a permit.” (Ibid.)
The high court concluded that “in our view the record does not reveal any rational basis for believing that the [group] home would pose any special threat to the city’s legitimate interests” and thus invalidated the city ordinance as applied to the group home in that case. (Cleburne, supra, 473 U.S. at . p. 448.) All nine justices in Cleburne agreed that the application of the city ordinance to require a special permit for the group home was unconstitutional. The majority opinion reflected the views of six justices. The other three justices would have gone further to hold that classification on the basis of mental retardation calls for heightened scrutiny and that the city ordinance was invalid not only as applied but also on its face. (Id. at p. 478 (cone. & dis. opn. of Marshall, J.).)
I have presented Cleburne's equal protection analysis in some detail because a careful reading of it confirms what many commentators have long observed: In addressing a statutory classification based on mental retardation, Cleburne did not apply conventional rational basis review. (E.g., Tribe, American Constitutional Law (2d ed. 1988) § 16-33, p. 1615 [Cleburne “applied] heightened scrutiny, despite ostensible application of the minimum rationality test”]; Wilkinson, The Dual Lives of Rights: The Rhetoric and Practice of Rights in America (2010) 98 Cal. L.Rev. 277, 296, fn. 117 [Cleburne “applied rational basis review with bite”]; Note, Rational Basis with Bite: Intermediate Scrutiny by Any Other Name (1987) 62 Ind. LJ. 779, 793-796 [same].) As Justice Marshall said, “Cleburne’s ordinance surely would be valid under the traditional rational-basis test applicable to economic and commercial regulation.” (Cleburne, supra, 473 U.S. at p. 456 (cone. & dis. opn. of Marshall, J.).) “To be sure, the Court does not label its handiwork heightened scrutiny,” but “Cleburne’s ordinance is invalidated only after being subjected to precisely the sort of probing inquiry associated with heightened scrutiny.” (Id; at p. 458.)
Whatever the label, Cleburne's analysis has two telling features that distinguish it from ordinary rational basis review. First, Cleburne repeatedly rejected the “one step at a time” rationale for requiring only the group home for the mentally retarded to obtain a special permit. There was nothing inherently irrational about the city’s contention that the group home presented concerns about flood risks, legal liability, density, and congestion. What Cleburne found irrational was the city’s failure to extend the permit requirement to other uses implicating the same concerns. This analysis defies the usual deference given to the legislature “to proceed in an incremental and uneven manner without necessarily engaging in arbitrary and unlawful discrimination.” (Maj. opn., ante, at p. 1110.)
*1138 Second, Cleburne expressly noted that “the record” did not support the city’s asserted justifications for treating the group home differently. (Cleburne, supra, 473 U.S. at p. 448 [“[I]n our view the record does not reveal any rational basis for believing that the [group] home would pose any special threat to the city’s legitimate interests . . . .” (italics added)]; id. at p. 450 [“At least this record does not clarify how ... the characteristics of the intended occupants of the [group] home rationally justify [differential treatment].” (italics added)].) Cleburne's insistence on record support for the city’s proffered rationales marks a clear departure from the ordinary rule that “legislative choice . . . may be based on rational speculation unsupported by evidence or empirical data.” (Beach Communications, supra, 508 U.S. at p. 315.) It was not irrational to speculate that the group home would present greater risks of legal liability or flood-related harms than other uses of the neighborhood. Nor was it irrational for the city to argue that “the discrimination was really motivated by a desire to protect the mentally retarded from the hazards presented by the neighborhood.” (Cleburne, supra, 473 U.S. at p. 455 (cone. opn. of Stevens, J.).) But the high court declined to uphold the permit requirement on the basis of such rational speculation in the absence of record support..
B.
Since Cleburne, the high court has addressed a statutory classification based on mental retardation in one other case, Heller, supra, 509 U.S. 312, which involved an equal protection challenge to differences in the statutory procedures for involuntary commitment of persons alleged to be mentally ill and persons alleged to be mentally retarded. Kentucky’s civil commitment statutes required proof of mental illness beyond a reasonable doubt, but required proof of mental retardation only by clear and convincing evidence. (Id. at p. 315.) In addition, Kentucky law authorized guardians and immediate family members, whether friendly or adverse to the potential committee, to participate as parties in commitment proceedings based on alleged mental retardation but not in proceedings based on alleged mental illness. (Ibid.) A class of persons involuntarily committed on the basis of mental retardation challenged both statutory distinctions.
In its equal protection analysis, the high court applied rational basis review and described the standard at some length. (Heller, supra, 509 U.S. at pp. 319-321.) Quoting extensively from a broad range of cases examining social and economic legislation, the court returned to the propositions that the legislature “need not ‘actually articulate at any time the purpose or rationale supporting its classification’ ” (id. at p. 320), that the legislature “has no obligation to produce evidence to sustain the rationality of a statutory classification” (ibid.), and that “a legislature’s generalizations” must be *1139 accepted “even when there is an imperfect fit between means and ends” (id. at p. 321). The court’s opinion mentioned Cleburne once, simply noting: “We have applied rational-basis review in previous cases involving the mentally retarded and the mentally ill. See Cleburne v. Cleburne Living Center, Inc.[, supra,} 473 U.S. 432 . . . .” (Heller, at p. 321.)
Applying conventional rational basis review, the high court reasoned that Kentucky’s different burdens of proof for mental illness and mental retardation could be justified on several reasonably conceivable grounds: the greater difficulty of diagnosing mental illness compared to diagnosing mental retardation, the greater accuracy of determining dangerousness based on past behavior in the case of mental retardation as opposed to mental illness, and the more invasive treatment to which the mentally ill are subjected as compared to the mentally retarded. (Heller, supra, 509 U.S. at pp. 322-326.) Four justices dissented from this part of the court’s opinion, noting the absence of record support for any of the hypothesized rationales and citing numerous scientific authorities casting doubt on the generalization that treatments for the mentally retarded are less invasive than treatments for the mentally ill. (Id. at pp. 337-346 (dis. opn. of Souter, J.).)
As for Kentucky’s different rules for participation of guardians and family members as parties in commitment proceedings, the high court said the distinction could plausibly be based on a greater need for privacy among persons diagnosed as mentally ill and on the greater likelihood that guardians and family members will have knowledge helpful to the trier of fact in the case of persons alleged to be mentally retarded as opposed to mentally ill. (Heller, supra, 509 U.S. at pp. 328-330.) On this point, three justices dissented, noting no record support for the court’s speculative generalization concerning the privacy needs of the two groups. (Id. at pp. 346-349 & fn. 9 (dis. opn. of Souter, J.).) The dissenters also explained that even if guardians and family members are more likely to have knowledge helpful to the fact finder in cases of alleged mental retardation as opposed to alleged mental illness, “[t]he Court simply points to no characteristic of mental retardation that could rationally justify” the participation of guardians and family members not only as witnesses but as parties—in essence, “a second prosecutor”—in one proceeding but not the other. (Id. at p. 347 (dis. opn. of Souter, J.).)
It is evident, as the dissenters observed, that although “Cleburne was the most recent instance in which [the high court] addressed a classification on the basis of mental disability,” Heller did not apply Cleburne’s analysis yet made no effort to distinguish it. (Heller, supra, 509 U.S. at p. 337 (dis. opn. of Souter, J.); see ibid. [“While the Court cites Cleburne once, and does not purport to overrule it, neither does the Court apply it, and at the end of *1140 the day Cleburne’s status is left uncertain.”].) The closely divided court’s unexplained departure from Cleburne, in which all nine justices endorsed at least the level of equal protection scrutiny applied by the majority opinion, detracts from Heller’s persuasive force in informing the proper interpretation of the equal protection guarantee under our state Constitution. (Cal. Const., art. I, § 7, subd. (a); see id., § 24 [“Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution . . . .”].)
More to the point, the primary thesis of the court’s opinion in Heller is that differences in commitment procedures reflect real differences between mental illness and mental retardation as opposed to “irrational prejudice against the mentally retarded” (Cleburne, supra, 473 U.S. at p. 450). The problem, however, is that the critical question of whether a classification based on mental retardation reflects real differences as opposed to irrational prejudice cannot be reliably answered without at least the level of analysis undertaken in Cleburne. Indeed, if any reasonably conceivable state of facts could support such a classification, then the permit requirement in Cleburne should have been upheld. For there are many generalizations within the realm of rational speculation that could have supported one or several of the city’s proffered justifications for distinguishing between mentally retarded persons and others. Without insisting on record facts to support those generalizations, there is no way to know whether they actually reflect real differences or simply assumptions consciously or unconsciously shaped by “ ‘a history of unfair and often grotesque mistreatment’ ” (id. at p. 454 (cone. opn. of Stevens, J.)).
The high court’s observation in Heller, citing Blackstone and others, that “differences in treatment between the mentally retarded and the mentally ill. . . have long existed in Anglo-American law” further illustrates the point. (Heller, supra, 509 U.S. at p. 326; see ibid. [“At English common law there was a ‘marked distinction’ in the treatment accorded ‘idiots’ (the mentally retarded) and ‘lunatics’ (the mentally ill). [Citation.]”].) How are we to know whether such historical practices were grounded in real differences or in prevailing prejudices of the sort that the archaic and pejorative labels seem to imply? As Justice Souter said, “[s]urely the Court does not intend to suggest that the irrational and scientifically unsupported beliefs of pre-19th-century England can support any distinction in treatment between the mentally ill and the mentally retarded today.” (Id. at p. 345, fn. 6 (dis. opn. of Souter, J.); see ibid. [“At that time, ‘lunatics’ were ‘[s]een as demonically possessed or the products of parental sin [and] were often punished or left to perish.’ [Citation.] The primary purpose of an adjudication of ‘idiocy’ appears to have been to ‘depriv[e] [an individual] of [his] property and its profits.’ [Citation.]”].) It may well be that “there is a commonsense distinction between the mentally retarded and the mentally ill.” (Id. at pp. 326-327 (maj. opn.).) But *1141 common sense may sometimes be wrong, or it may provide no support for a particular legislative classification.
California is among the majority of states with separate commitment schemes for mentally ill and mentally retarded individuals. Traditionally, commitment statutes for the mentally retarded “provided less procedural protection than commitment statutes for the mentally ill and were less explicit with respect to commitment criteria . . . .” (Melton et al., Psychological Evaluations for the Courts: A Handbook for Mental Health Professionals and Lawyers (2d ed. 1997) p. 333 (Melton).) California’s commitment statutes reflect the general pattern. As discussed earlier {ante, at pp. 1098-1100), the LPS Act as enacted in 1967 provided a right to counsel for persons alleged to be mentally ill, and by 1970, the LPS Act guaranteed such persons facing prolonged commitment the right to demand a jury trial as well as an advisement of that right. By contrast, the section 6500 scheme did not include a right to counsel for persons alleged to be mentally retarded until 1975, and the right to a jury trial has been secured gradually through case law (see maj. opn., ante, at pp. 1096-1097 & fn. 14).
In explaining these disparities, one authority has observed that “the law’s approach to people with mental retardation, premised on the irreversibility of their condition, was less solicitous of their property and person than was the case with people suffering from mental illness. In addition, there may have been an underlying assumption that people with mental retardation require less legal protection because they are more easily identifiable than people with mental illness and thus are less likely to be committed arbitrarily.” (Melton, supra, at p. 333.) But the same authority concludes that such distinctions are “unjustified”: “In reality, there is no reason for treating individuals differently based on their diagnosis as far as the legal structure for commitment is concerned. The line between ‘mental retardation’ and ‘normal’ intellectual and adaptive functioning is as difficult to discern as that between ‘mental illness’ and ‘mental health.’ ” (Ibid.)
I would not go so far as to suggest that there must be strict equality between the commitment procedures applicable to mental illness and mental retardation. Such a broad rule, whether correct or not, is not necessary to decide this case. The question here is whether a difference in procedure concerning jury trial advisement can be justified on the basis of real differences between the two groups as opposed to some latent bias. As Cleburne recognized, that question cannot be answered by simply positing any reasonably conceivable state of facts concerning the two groups. Instead, the “record [must] clarify how ... the characteristics of [persons facing commitment under section 6500] rationally justify denying to [them]” the advisement to which persons facing commitment under section 5300 are entitled. (Cleburne, supra, 473 U.S. at p. 450.)
*1142 C.
The evolution of public policy and scientific understanding over the past half-century has not effaced the distinction between mental illness and mental retardation. Instead, it has reinforced the principle implicit in Cleburne that unsupported generalizations about any group based on mental disability carry a substantial risk of harm. As recounted above (ante, at pp. 1098-1100), legal reforms extending civil rights and other protections to persons with mental illness have tended to precede similar reforms affecting persons with mental retardation. But a number of developments since the 1970s, when section 6500 largely took its current form, have sought to counter the historic tendency to treat persons with mental retardation on the basis of categorical and unfounded assumptions of deficits and incapacities, and instead to enable each person to realize and act on his or her individual abilities.
The 1970s saw a wave of legislation advancing the rights of individuals with disabilities. (See Rothstein & Irzyk, Disabilities and the Law (4th ed. 2012) §§ 1:2, 1:9, pp. 4-7, 28-29.) Congress enacted the Rehabilitation Act of 1973 (29 U.S.C. § 701 et seq.), which addressed vocational rehabilitation and employment opportunities for individuals with physical or mental disabilities. (Pub.L. No. 93-112 (Sept. 26, 1973) 87 Stat. 355.) Section 501 of the Rehabilitation Act requires nondiscrimination and affirmative action by federal employers (29 U.S.C. § 791), and section 503 of the act does the same for federal contractors (29 U.S.C. § 793). Section 504 of the Rehabilitation Act—“the most significant federal protection for individuals with disabilities” until the Americans with Disabilities Act of 1990 (42 U.S.C. § 1201 et seq.) (Rothstein & Irzyk, Disabilities and the Law, supra, at p. 5)—requires nondiscrimination and reasonable accommodation by recipients of federal money (29 U.S.C. § 794), including schools, public facilities, transportation agencies, and health and welfare services. These requirements reflect Congress’s policy of “respect for individual dignity, personal responsibility, self-determination, and pursuit of meaningful careers, based on informed choice, of individuals with disabilities.” (29 U.S.C. § 701(c)(1).)
In 1975, Congress enacted the Education for All Handicapped Children Act, which exemplified the emerging principle of treating persons with disabilities on the basis of individual ability: “ ‘It is the purpose of this Act to assure that all handicapped children have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs ....’” (Pub.L. No. 94-142, § 3(a) (Nov. 29, 1975) 89 Stat. 773.) This legislation along with its successor, the Individuals with Disabilities Education Act (20 U.S.C. § 1400 et seq. [Pub.L. No. § 901 (Oct. 30, 1990) 104 Stat. 1103]), established the entitlement of each child with a disability to an individualized education program *1143 “tailored to a child’s unique needs [and] designed by the school district in consultation with the child’s parents.” (Forest Grove School Dist. v. T. A. (2009) 557 U.S. 230, 234, fn. 1 [174 L.Ed.2d 168, 129 S.Ct. 2484]; see 20 U.S.C. §§ 1412(a)(4), 1414(d).)
Also in 1975, Congress enacted the Developmentally Disabled Assistance and Bill of Rights Act, which called for individualized treatment and services: “ ‘The treatment, services, and habilitation for a person with developmental disabilities should be designed to maximize the developmental potential of the person and should be provided in the setting that is least restrictive of the person’s personal liberty.’ ” (Pub.L. No. 94-103, § 201 (Oct. 4, 1975) 89 Stat. 486.) As a condition of receiving federal funding under this law and its successor statutes, each state is required to adopt a plan that assures, among other things, that “any direct services provided to individuals with developmental disabilities and funded under the plan will be provided in an individualized manner, consistent with the unique strengths, resources, priorities, concerns, abilities, and capabilities of such individual.” (42 U.S.C. § 15024(c)(5)(G).)
In 1990, Congress passed the Americans with Disabilities Act of 1990 (ADA), prohibiting discrimination against individuals with physical or mental disabilities. (Pub.L. No. 101-336 (July 26, 1990) 104 Stat. 327.) Notably, the ADA forbids discrimination based on “an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.” (42 U.S.C. § 12102(3)(A).) The workplace nondiscrimination and reasonable accommodation requirements of the ADA continue Congress’s policy of ensuring that persons with disabilities are treated on the basis of their individual talents and abilities rather than their actual or perceived limitations. (42 U.S.C. §§ 12111(8), (9), 12112(b).)
Recent legislation has changed the language that statutes use to refer to individuals with disabilities. In 2010, Congress replaced the phrase “mental retardation” with “intellectual disability” in the federal codes. (Pub.L. No. 111-256 (Oct. 5, 2010) 124 Stat. 2643.) Although such changes are sometimes disparaged as acts of political correctness, a Senate report explained: “[T]he terms ‘mentally retarded,’ ‘mental retardation,’ and variations of these terms, to describe individuals with intellectual disabilities are anachronistic, needlessly insensitive and stigmatizing, and clinically outdated. Terms to describe individuals with intellectual disabilities have gone through a steady evolution over the past two centuries, each iteration describing those living with the condition in a pejorative way. At the turn of the 20th century, people who were viewed as having limitations in intellectual advancement and social behavior were institutionalized. The prevailing sentiment at the time being that such people could not, should not, interact with people *1144 without disabilities. [][] ‘Imbecile,’ ‘moron,’ ‘idiot,’ and ‘feeble-minded’ are all terms which have been used to reference people with cognitive disabilities by the public and in our Federal statutes. Each of these terms focused on perceived deficiencies to describe such individuals. The most recent term— ‘mental retardation’—was used to characterize those with cognitive disabilities as having general diminished capacities for cognitive functioning. Physicians, advocates, and law makers now understand that this term does not accurately describe these individuals.” (Sen.Rep. No. 111-244, 2d Sess., p. 2 (2010).) Just weeks ago, our Legislature similarly replaced the term “mental retardation” and related language with “developmental disability” throughout the section 6500 scheme. (Assem. Bill No. 1472, approved by Governor, June 27, 2012 (2011-2012 Reg. Sess.).)
All of these developments have sought to overcome the historical practice in our nation and our state of categorically treating persons with intellectual disabilities as incapable of understanding their own circumstances or participating in public institutions and civic life. To be sure, there are real differences between persons with such disabilities and others. Such differences, however, can only be distinguished from entrenched and possibly unfounded assumptions by insisting on an actual, demonstrable basis—and not mere hypothesis or conjecture—for treating people differently because of that disability.
D.
For the foregoing reasons, I would hold as a matter of state equal protection law that the Cleburne standard is the proper standard of review for evaluating statutory classifications based on mental retardation. Whatever Cleburne’s status may be as a matter of federal law after Heller, we have long noted that “our state equal protection provisions, while ‘substantially the equivalent of’ the guarantees contained in the Fourteenth Amendment to the United States Constitution, are possessed of an independent vitality which, in a given case, may demand an analysis different from that which would obtain if only the federal standard were applicable.” (Serrano v. Priest (1976) 18 Cal.3d 728, 764 [135 Cal.Rptr. 345, 557 P.2d 929].) The independent vitality of our state equal protection guarantee has led this court to hold—upon canvassing judicial, legislative, and other historical developments in a similar manner as I have done here—that strict scrutiny applies to laws that discriminate on the basis of sexual orientation or gender, even though federal courts review such laws under less stringent standards. (Compare In re Marriage Cases (2008) 43 Cal.4th 757, 821-823, 843-844 [76 Cal.Rptr.3d 683, 183 P.3d 384] and Sail’er Inn, Inc. v. Kirby (1971) 5 Cal.3d 1, 17-20 [95 Cal.Rptr. 329, 485 P.2d 529] with Romer v. Evans (1996) 517 U.S. 620, 631-635 [134 L.Ed.2d 855, 116 S.Ct. 1620] and Mississippi University for *1145 Women v. Hogan (1982) 458 U.S. 718, 724 [73 L.Ed.2d 1090, 102 S.Ct. 3331].) Consistent with this interpretive tradition, I conclude that Cleburne’s rational basis scrutiny applies as a matter of state law to distinctions based on mental retardation.
This court’s equal protection jurisprudence has generally applied a two-tiered approach that subjects challenged classifications either to strict scrutiny or to rational basis review. Although Cleburne applied neither strict scrutiny nor conventional rational basis review, I do not see much to be gained by multiplying labels to further differentiate among tiers of review. (Cf. Cleburne, supra, 473 U.S. at p. 451 (cone. opn. of Stevens, J.) [“[O]ur cases reflect a continuum of judgmental responses to differing classifications which have been explained in opinions by terms ranging from ‘strict scrutiny’ at one extreme to ‘rational basis’ at the other. I have never been persuaded that these so-called ‘standards’ adequately explain the decisional process.”].) The essence of rational basis review is that a legislative classification “must be rationally related to a legitimate governmental purpose.” (Id. at p. 446 (maj. opn.).) Like all doctrinal tests, this general requirement acquires greater specificity through application, and Cleburne, in my view, elucidates the proper application of rational basis review where a statutory classification is based on mental retardation as opposed to distinctions among cable television facilities (Beach Communications, supra, 508 U.S. 307), eye care professionals (Lee Optical, supra, 348 U.S. at p. 489), or tort victims (American Bank, supra, 36 Cal.3d at pp. 373-374).
In reaching this conclusion, I am mindful of Cleburne’s observation that policies “singling out the retarded for special treatment” are “in the vast majority of situations . . . not only legitimate but also desirable.” (Cleburne, supra, 473 U.S. at p. 444.) Unlike strict or intermediate scrutiny, the rational basis test recognizes that “[especially given the wide variation in the abilities and needs of the retarded themselves, governmental bodies must have a certain amount of flexibility and freedom from judicial oversight in shaping and limiting their remedial efforts.” (Id. at p. 445.) Nevertheless, it is appropriate that Cleburne’s skepticism toward unsubstantiated generalizations and legislative inconsistency applies equally to “remedial” laws that purport to benefit individuals with intellectual disabilities. For if there is any lesson to be learned from this area of history, it is that the injurious character of many benignly motivated policies became apparent only after objective inquiry or scientific advancement revealed their unfounded premises for what they were. The officials who approved the sterilization of Carrie Buck, for example, seemed confident that they were doing so for her own good. (Ante, at p. 1121.) It is possible that some policies we today regard as remedial will, upon finer inspection, come to be regarded tomorrow as unwarranted paternalism.
*1146 Although the court says Cleburne is “outmoded in this context” (maj. opn., ante, at p. 1111, fn. 21), other courts have continued to rely on Cleburne for its approach to rational basis review even after Heller. (See, e.g., Massachusetts v. U.S. Dept, of Health & Human Services (1st Cir. 2012) 682 F.3d 1, 10-11 [citing Cleburne to show that “equal protection assessments are sensitive to the circumstances of the case and not dependent entirely on abstract categorizations”]; Vision Mining, Inc. v. Gardner (Ky. 2011) 364 S.W.3d 455, 466-469 [citing Cleburne in concluding that “the rational basis standard, while deferential, is certainly not demure”]; Ferdon ex rel. Petrucelli v. Wis. Patients Comp. Fund (2005) 284 Wis.2d 573 [701 N.W.2d 440, 461-462] [citing Cleburne in explaining that “[t]he rational basis test is ‘not a toothless one’ ”].) In any event, even if Heller has “superseded” Cleburne (maj. opn., ante, at p. 1111, fn. 21), the court provides no real analysis as to why Heller and not Cleburne should frame the standard of review that applies to discrimination on the basis of mental retardation under state equal protection principles—even though this issue has not previously been settled by our court, even though article I, section 24 of the California Constitution says that “[r]ights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution,” even though we have adopted equal protection standards that are more stringent than federal standards in other areas, and even though the history of discrimination on the basis of mental retardation clearly distinguishes this kind of discrimination from ordinary economic and social legislation. Far from “crafting [my] own constitutional theory of equal protection” (maj. opn., ante, at p. 1111, fn. 21), I have provided an explicit and reasoned explanation as to why the Cleburne approach is appropriate here, using the same type of analysis that our court has used in the past when confronted with similarly novel equal protection issues. By contrast, the court simply does not engage this issue apart from asserting that “we have correctly applied [.Heller]” and that Cleburne’s approach is “unduly strict” and thus improper here. (Maj. opn., ante, at p. 1111, fn. 21.) We do not ordinarily decide important questions of constitutional law in such a conclusory manner.
E.
Applying Cleburne’s principles to the instant case, I conclude that the record reveals no rational basis for requiring courts to provide a jury trial advisement to persons facing commitment under section 5300 but not to persons facing commitment under section 6500. Cleburne’s analysis forecloses reliance on a “one step at a time” rationale. If the difference in commitment procedure is to be sustained, it must be on the basis of a valid generalization about each group’s ability to understand the advisement. But there are no legislative findings or other facts on record to support such a generalization.
*1147 There is nothing irrational about a conjecture that the proportion of mentally disordered persons facing a 180-day commitment under the LPS Act who can understand the advisement is greater than the comparable proportion among persons alleged to be mentally retarded under section 6500. But it is a mere conjecture nonetheless. As previously discussed (ante, at p. 1102), a person facing a 180-day commitment under section 5300 is a person actually (not allegedly) suffering from a mental disorder who has already undergone a 72-hour evaluation and treatment period (§ 5150) followed by a 14-day “intensive treatment” period (§ 5250) and possibly an “additional” 30-day period of “intensive treatment” (§ 5270.15). Despite such treatment, such a person is alleged to “present[], as a result of mental disorder or mental defect, a demonstrated danger of inflicting substantial physical harm upon others.” (§ 5300.) It is a fair inference that many such individuals are so mentally disordered that, even with treatment, they cannot understand a jury trial advisement. Meanwhile, given the range of cognitive abilities among persons diagnosed as mentally retarded and among persons merely “alleged” to be mentally retarded under section 6500, it is a fair inference that many such individuals are, with or without treatment, capable of understanding a jury trial advisement. (Ante, at p. 1102.) The record before us provides no factual basis to determine whether the two groups really differ with respect to ability to understand an advisement and, if so, whether the difference is large or small.
Moreover, although the Legislature could have believed the benefits of an advisement requirement to be worth the administrative burden in section 5300 proceedings but not in section 6500 proceedings, there are no facts or findings in the record to support the rationality of such a legislative judgment. Of course, every procedural requirement presents an incremental burden. But it is not obvious how burdensome an advisement really is, especially when considered apart from any right to personal waiver. It is possible that a court reporter may be necessary to record the advisement. But there is no need for a competency hearing with respect to an advisement alone. Although some individuals will not understand an advisement, others will. If the efficiency of an advisement requirement were expressed as a ratio of its benefits to its burdens, the ratio would remain quite large even if the magnitude of the benefits varied from group to group, so long as the magnitude of the burdens was much smaller. The lack of any record indication of how burdensome it is to provide a jury trial advisement makes it difficult to conclude that the statutory distinction at issue reflects considerations of administrative efficiency that merely “burden the retarded in what is essentially an incidental manner” (Cleburne, supra, 473 U.S. at p. 446).
Importantly, my analysis does not suggest that the Legislature is foreclosed from adopting different commitment procedures (short of procedures implicating a fundamental right) based on generalizations about persons who are *1148 mentally disordered and persons who are alleged to be mentally retarded. The problem in this case is that such generalizations lack any factual basis in the record that would dispel an inference of irrational prejudice, and thus the statutory distinction is invalid as presently drawn. However, the Legislature would remain free, in my view, to reenact the distinction if it were to articulate and provide some factual support for its classificatory rationale. (Cf. Califano v. Goldfarb (1977) 430 U.S. 199, 221-222 & 223, fn. 9 [51 L.Ed.2d 270, 97 S.Ct. 1021] (cone. opn. of Stevens, J.) [finding Social Security survivors’ benefit statute invalid because Congress “simply assumed that all widows [(but not widowers)] should be regarded as ‘dependents,’ ” but leaving open the possibility that “an actual, considered legislative choice would be sufficient to allow this statute to be upheld”].) Legislative inquiry might reveal that most persons facing commitment under section 6500 are more than mildly retarded, that most persons facing commitment under section 5300 are not cognitively impaired, or that an advisement requirement presents administrative burdens that are not immediately obvious. When the Legislature has provided actual reasons and made findings to support a classification on the basis of mental retardation, the resulting statute is entitled to a high degree of deference. The Legislature may properly consider the efficiency of procedures designed to commit persons with mental disabilities who are dangerous to themselves or others, and a reviewing court should refrain from second-guessing the Legislature’s actual, factually supported judgment that a particular classification is rationally related to a legitimate articulated purpose.
Finally, the term “irrational prejudice” (Cleburne, supra, 473 U.S. at p. 450) merits a brief comment. When it is said that a hypothesized yet unsubstantiated generalization is not sufficient to negate an inference of irrational prejudice, I do not think a necessary or even proper implication is that the policy in question was born of subjective animus. I would not suggest, for example, that the legislators who supported the enactment of section 6500 (or the citizens who elected those legislators) were motivated by ill will toward persons alleged to be mentally retarded. Instead, an irrational prejudice may, and most often does, arise from good faith adherence to unexamined assumptions that reflect historic or prevailing attitudes. In recent decades, many legislative developments concerning involuntary commitment have perhaps reflected a widespread belief that because mental illness is less permanent and more treatable than mental retardation, people who are mentally ill are “closer to normal” than people who are mentally retarded. Whatever merit such a totalizing assumption may have as a general matter, it cannot alone—in the absence of relevant supporting facts—justify a particular legislative classification without taking on the character of an irrational prejudice in that specific context.
*1149 F.
While holding that persons facing commitment under section 6500 have a right to a jury trial, today’s' opinion characterizes the advisement that Barrett seeks as an “ancillary,” “collateral,” or “additional adjunct” procedure. (Maj. opn., ante, at pp. 1100, 1104, 1097.) Potential committees have a right to counsel (§ 6500), and the court says counsel “is presumed competent and informed as to applicable constitutional and statutory law” and “can be expected, where necessary or advisable, to consult with the client about jury trial concerns.” (Maj. opn., ante, at p. 1105.) This may be a pertinent response to Barrett’s due process claim. But it is no answer to her equal protection claim because one could just as easily say that the right to counsel adequately protects the jury trial right of individuals facing commitment under section 5300. Indeed, section 5302 requires a jury trial advisement even as it not only provides for a right to counsel but also expressly instructs that “[t]he attorney shall advise the person of his rights in relation to the proceeding . . . .”
It may be true that counsel generally knows best and that the option to demand or waive a jury trial will typically result in the same decision whether an advisement is given or not. But the importance of an advisement goes beyond its instrumental value. Whether or not an advisement alters the ultimate choice to proceed with or without a jury, it expresses the legal system’s respect for the individual as a participant in, and not a mere object of, the commitment proceedings. For those who are capable of understanding it, an advisement by the court recognizes their dignity as well as their ability to comprehend and possibly participate in an important aspect of a proceeding that may adversely and irreversibly shape the rest of their lives. Having extended this recognition to some persons with mental disabilities, the Legislature must have an actual, considered rationale for not extending it to others.
In sum, the instant case implicates two sensitivities that run deep in the history of society’s treatment of persons with intellectual disabilities. The first is an unfounded assumption of incapacity. As previously noted (ante, at p. 1103), the section 6500 scheme does not assume that all individuals facing commitment lack the ability to comprehend an advisement. Nor should it assume, without supporting facts, that proportionally more persons lack such ability in proceedings under section 6500 than in proceedings under section 5300.
Second, the assumption of incapacity occurs in the context of a proceeding that may result in precisely the sort of isolation and segregation that reinforces and perpetuates the assumption of incapacity. As Congress recognized among its findings when it passed the ADA, “historically, society has *1150 tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem . . . (42 U.S.C. § 12101(a)(2).)
It is true that an order of commitment under section 6500 “expire[s] automatically one year after” it is made. (§ 6500.) But a person may be recommitted year after year, without limit, through procedures that are “the same as with an initial petition for commitment.” (Ibid.) Where a trial court finds an individual to be mentally retarded—a condition that “never recede^]” (maj. opn., ante, at p. 1103)—and where the court also finds, as it did here, that “the danger she posed to herself and others was based upon, and caused by, her mental retardation” (id. at p. 1092), the initial commitment proceeding and the findings made therein potentially lay the groundwork for lengthy, possibly even lifetime confinement. (See Melton, supra, at p. 334 [“the relatively stable nature of their condition” means hospitalization of people with mental retardation “could amount to confinement for life”].) Before being consigned to such a fate, a person alleged to be mentally retarded is entitled to the same advisement, and the same respect and recognition, that the Legislature has seen fit to grant other persons with mental disabilities who are facing prolonged commitment. That such respect and recognition may be “largely symbolic” (maj. opn., ante, at p. 1111, fn. 21) does not diminish the importance of Barrett’s claim, for it is evident from many historic claims of equality vindicated by our court and others that the principle of equal protection “often bears its fruit in those regions where symbol becomes substance.” (Karst, Equal Citizenship Under the Fourteenth Amendment (1977) 91 Harv. L.Rev. 1, 6.)
VI.
The Court of Appeal found that even if Barrett was entitled to advisement and personal waiver of her jury trial right, the error was harmless in light of the evidence of her mental retardation and dangerousness: “There was no dispute that Barrett is a person with mental retardation. And, given her recent history, as documented in the reports attached to the petition for commitment and the testimony of Robert Thomas, there was substantial evidence that she is a danger to herself or others, even though there was no evidence that anyone, as yet, had suffered actual and serious physical injury as a result of her behavior. She regularly assaulted others and engaged in self-mutilation and suicidal ideation. And though Barrett disputes it, there was undisputed evidence, as the trial court found, that her mental retardation is a substantial factor in her inability to control her dangerous behavior.”
I agree with the Court of Appeal that the failure to advise was not structural error requiring automatic reversal. The Court of Appeal applied the *1151 harmless error standard for federal constitutional error (Chapman v. California (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]), but “application of a state harmless-error rule is, of course, a state question where it involves only errors of state procedure or state law” (id. at p. 21). Here, even if the Legislature violated the federal as well as state equal protection guarantee by failing to afford Barrett the same right to advisement afforded under section 5302, the error in Barrett’s trial was the denial of a state statutory right. If the Legislature were to correct the constitutional violation tomorrow by amending section 6500, any subsequent advisement error would be subject to state harmless error analysis. The same is true today. Applying People v. Watson (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243], I would conclude on the basis of the evidence that there was no reasonable probability Barrett would have achieved a more favorable outcome had she been tried by a jury.
Accordingly, I join the court’s disposition affirming the judgment of the Court of Appeal. But I would hold that Barrett is entitled to advisement of her right to a jury trial in any future proceeding under section 6500.
Appellant’s petition for a rehearing was denied September 19, 2012.